TIMOTHY COURCHAINE
United States Attorney
District of Arizona

BRUCE R. VAN BAREN
Illinois State Bar No. 6310375
Assistant United States Attorney
Two Renaissance Square
40 North Central Avenue, Suite 1800
Phoenix, Arizona 85004
Telephone: 602-514-7500
Email: bruce.van.baren@usdoj.gov
Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>                Plaintiff,<br><br>        v.<br><br>Andrew Paul Amarillas<br><br>                Defendant. | Case No. CR-26-00278-PHX-SPL (DMF)<br><br>**UNITED STATES OF AMERICA'S<br>DETENTION MEMORANDUM** |

## I.      INTRODUCTION

Defendant is an active-duty U.S. Marine. But instead of faithfully serving his country, he has been stealing weapons and ammunition from the military base at which he was stationed for several years. This has included Javelin Missile Systems and AT4 anti-tank weapons, ammunition so lethal that the public cannot legally possess it, and other U.S. military ammunition. And this is just what the U.S. Army Criminal Investigations Division, Homeland Security Investigations, and the Bureau of Alcohol, Tobacco, Firearms & Explosives' investigation has uncovered to date. The full extent of how much Defendant stole, to whom he all sold it, and how it has been used is not yet known—though law enforcement is working feverishly to find out. Given the nature and circumstances of the offense, Defendant presents a clear danger to others and the community if released.

What's more is that just days after law enforcement executed a federal search warrant on one of the people in Arizona to whom Defendant was supplying U.S. military weapons

and ammunition, Defendant destroyed his phone (telling his parents he accidentally drove over it). Law enforcement's review of his co-conspirator's phone made clear why he did so: his text messages dating back to 2024 proved his guilt in this case beyond a reasonable doubt. And if released, Defendant is likely to be deployed overseas—he was just issued his U.S. Official Passport so he could go to Myanmar—or returned to Camp Pendelton where he will be able to tamper with additional evidence and witnesses. There is a serious risk therefore that Defendant will not appear as required or attempt to obstruct justice.

Because no condition or combination of conditions can ensure Defendant's appearance as required, prevent him from attempting to obstruct justice, or ensure the safety of others and the community, this Court should detain Defendant pending trial.

## II.    BACKGROUND

Defendant has been an active-duty Marine since about 2021. (PTSR at 2.) From about February 2022 through January 2026, he was stationed at Camp Pendleton in California. (Doc. 3 ¶ 6.) During that time, Defendant was an Ammunition Technician Specialist responsible for U.S. military explosive and ammunition ordnance. (Doc. 3 ¶ 6.) During his entire tenure at Camp Pendleton, he was assigned to the School of Infantry West—the second stage of U.S. military training for enlisted Marines after recruit training—where he transported and handled U.S. military explosives and ammunition. (Doc. 3 ¶ 6.)

Defendant stole U.S. military property and ammunition for which he was responsible for safe keeping, transporting, and/or disposing at Camp Pendleton in California and transported these items to his home state of Arizona. (Doc. 3 ¶ 7.) Once in Arizona, Defendant sold this stolen U.S. military property to Co-Conspirator 1 and Co-Conspirator 2. (Doc. 3 ¶ 7.) Co-Conspirators 1 and 2, in turn, sold them to Company 2 and others. (Doc. 3 ¶ 7.) And Company 2, in turn, sold them to Company 1 and others. (Doc. 11 ¶ 2.)

The U.S. military property and ammunition that Defendant agreed to steal and sell to others included Javelin Missile Systems and Olin Winchester-manufactured Enhanced Performance Rounds ("EPR") and non-EPR ammunition. (Doc. 3 ¶ 8.) Javelin Missile Systems are manufactured by the Javelin Joint Venture between Lockheed Martin Corp.

2

("Lockheed Martin") and RTX Corp. f/k/a Raytheon Technologies Corp. ("Raytheon") exclusively for sale to the U.S. Department of War and cannot be legally possessed by, or sold to, the public unless demilitarized. (Doc. 3 ¶ 9.) Law enforcement seized one of the Javelin Missile Systems that Defendant agreed to steal and sell. (Doc. 3 ¶ 9.) It was not demilitarized. (Doc. 3 ¶ 9.) Olin Winchester, LLC ("Olin Winchester") manufacturers EPR in 5.56mm ("M855A1") and 7.62mm ("M80A1") at a U.S. Government-owned, contractor-operated facility—the Lake City Army Ammunition Plant in Independence, Missouri—and two contractor-owned and operated facilities in Oxford, Mississippi. (Doc. 3 ¶ 10.) M855A1 and M80A1 are federally controlled items that are limited to U.S. Government sales due to their increased terminal performance, making them a threat to law enforcement and civilians. (Doc. 3 ¶ 10.) M855A1 cannot be legally possessed by, or sold to, the public. (Doc. 3 ¶ 10.) Olin Winchester also manufactures non-EPR ammunition in 5.56mm ("M855"). (Doc. 3 ¶ 11.) Unlike M855A1 and M80A1, M855 can be bought directly from Olin Winchester and sold to the public, but M855 that was manufactured for, and sold to, the U.S. Department of War cannot legally be possessed by, or sold to, the public. M855 ammunition manufactured for, and sold to, the U.S. military is in different packaging than M855 ammunition manufactured for, and sold commercially to, the public. (Doc. 3 ¶ 11.)

U.S. Marine Corps policy—on which Ammunition Technician Specialist at Camp Pendleton are trained—only permits the use, transport, and release of U.S. military property and ammunition for official military duties and prohibits any unauthorized use, transfer, or release of these items. (Doc. 3 ¶ 12.) Defendant never obtained authorization from the U.S. military to remove Javelin Missile Systems and M855A1 and M855 from Camp Pendleton, transport them to Arizona, and sell them to civilians for his own profit. (Doc. 3 ¶ 12.)

During the time that Defendant was an Ammunition Technician Specialist at Camp Pendleton, assigned to handle and transport explosives and ammunition at the School of Infantry West, law enforcement identified stolen U.S. military ammunition for sale commercially in Arizona and throughout the United States. (Doc. 3 ¶ 13.) This was particularly concerning given reporting that U.S. military-grade ammunition was being

found at the scene of mass shootings, including multiple school shootings, across the United States. *See* Ben Dooley and Emily Rhyne, *Army Ammunition Plant Is Tied to Mass Shootings Across the U.S.*, N.Y TIMES, Nov. 12, 2023, at A1, *available at* https://www.nytimes.com/2023/11/11/us/army-ammunition-factory-shootings.html (last visited Mar. 25, 2026). Thereafter, law enforcement launched an investigation, which included undercover law enforcement officers buying stolen M855A1 and M855 from Company 1 and Company 2 in Arizona, and law enforcement seizing stolen M855A1 and M855 from Co-Conspirator 2, Company 1, and Company 2 in Arizona. (Doc. 3 ¶ 13.)

Law enforcement traced the lot numbers on the cans of much of this stolen U.S. military ammunition from the Tooele Army Depot in Utah to the Ammo Supply Point at Camp Pendleton, and from the Ammo Supply Point to the School of Infantry West where Defendant was responsible for explosives and ammunition ordnance. (Doc. 11 ¶ 9.) U.S. Marine Corps records from the School of Infantry West showed that Defendant signed out U.S. military ammunition with some of these lot numbers. (Doc. 11 ¶ 9.) Most relevant here, U.S. Marine Corps records showed that Defendant had signed out the Javelin Missile System that law enforcement recovered from Company 2 and U.S. military ammunition seized from Co-Conspirator 2 soon after Defendant had delivered it to him. (Doc. 11 ¶¶ 10-13.)

### III.    LEGAL STANDARD

The Bail Reform Act of 1984, 18 U.S.C. § 3142 *et seq.*, requires the Court to order a defendant detained pending trial where it finds, after a detention hearing, that no condition or combination of conditions will reasonably assure the safety of the community and the appearance of the defendant at future court proceedings. 18 U.S.C. § 3142(e)(1); *United States v. Gebro*, 948 F.2d 1118, 1121 (9th Cir. 1991). Congress passed this law to respond to "the alarming problem of crimes committed by persons on release." *United States v. Salerno*, 481 U.S. 739, 742 (1987) (citation omitted). At the detention hearing, the United States bears the burden of showing by clear and convincing evidence that a defendant is a danger to any other person or the community and by a preponderance of the evidence that the defendant poses a flight risk. 18 U.S.C. § 3142(f)(2)(B); *Gebro*, 948 F.2d at 1121.

In making this determination, the Court must weigh the following factors:

> (1) the nature and circumstances of the offense charged …; (2) the weight of the evidence against the person; (3) the history and characteristics of the person, including—(A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and (B) whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release.

18 U.S.C. § 3142(g). When considering the first factor—the nature of the offenses charged, the Court must consider the penalties for the charges and incentive to flee. *United States v. Townsend*, 897 F.2d 989, 995 (9th Cir. 1990). The second factor—the weight of the evidence—"is the least important of the various factors." *United States v. Motamedi*, 767 F.2d 1403, 1408 (9th Cir. 1985). And with respect to the fourth factor—the nature and seriousness of the danger the defendant poses, danger also encompasses pecuniary or economic harm. *United States v. Reynolds*, 956 F.2d 192, 192-93 (9th Cir. 1992).

At the detention hearing, the United States may proceed by way of proffer. *United States v. Winsor*, 785 F.2d 755, 756 (9th Cir. 1986). Moreover, the Federal Rules of Evidence do not apply to evidence introduced during the detention hearing, and the Court may therefore consider hearsay evidence. 18 U.S.C. § 3142(f); Fed. R. Evid. 1101(d)(3).

### IV.    ARGUMENT

A careful weighing of the § 3142(g) factors establishes that Defendant is a serious flight risk and that there is a serious risk that he will obstruct or attempt to obstruct justice by a preponderance of the evidence, and that he is a danger to others by clear and convincing evidence. This Court should therefore order Defendant to be detained pending trial.

### A.    Nature and Circumstances of Defendant's Offenses

The nature and circumstances of the offense weigh strongly in favor of detention. Defendant stole weapons and ammunition of war and sold them to others to enrich himself.

In Count 2 of the Indictment (Doc. 11), the United States charged Defendant with stealing and embezzling the Javelin Missile System with serial number 321675 that he signed out from the School of Infantry West in August 2024 (pictured below, left). (Doc. 3 ¶ 24.) Defendant's text messages with his co-conspirators prove that he stole and sold other such weapons. For example, in June 2025, after Co-Conspirators 1 and 2 exchanged text messages about whom "Andrew" was going to leave "that stuff with," Co-Conspirator 1 text messaged Co-Conspirator 2 an image of (1) a rifle with a scope sitting on the top of a large, plastic crate; (2) a rifle with a scope sitting on top of a bed; and (3) two Javelin Missile Systems (pictured below, right), and said, "Scope is on ready to go with ammo." (Doc. 3 ¶¶ 25-26.) About two months later, in August 2025, Defendant text messaged Co-Conspirator 2, "[J]ust [got] some javs and some other ones[.]" (Doc. 3 ¶ 27.) He further explained, "[I] have 2 launders that [I] think you'd like, if you want to take a look tomorrow." (Doc. 3 ¶ 27.) Co-Conspirator 2 responded, "I can[.] I still have the other one too." (Doc. 3 ¶ 27.) Defendant responded, "[O]kay sounds good and dang, [I]'m hoping they move soon[.]" (Doc. 3 ¶ 27.) Co-Conspirator 2 agreed, "Yeah, me too[.]" (Doc. 3 ¶ 27.)

 

In addition, Defendant stole and sold large volumes of U.S. military ammunition seemingly with the help of others at Camp Pendleton. For example, in November 2025, Defendant text messaged Co-Conspirator 2, "[I]t's on again," but that he's "not sure how

much [I'm going to be] having but [I]'ll be by" and noted that he was "trying to stay consistent [u]ntil [I]'m gone." (Doc. 3 ¶ 27.) (Defendant was scheduled to leave Camp Pendleton for an eight-week training course in Quantico, Virginia from January to March 2026. (Doc. 3 ¶ 28.) Law enforcement arrested him before he completed that training and before the U.S. Marine Corps deployed him to protect the U.S. Embassy in Myanmar.)

Just over a week later, on or about November 8, 2025, Co-Conspirator 2 text messaged Defendant, "What's up[?]" (Doc. 3 ¶ 29.) Defendant responded, "[S]ome cans[.]" (Doc. 3 ¶ 29.) Co-Conspirator 2 asked, "How many[?]" (Doc. 3 ¶ 29.) Defendant responded, "30[.]" (Doc. 3 ¶ 29.) Co-Conspirator 2 asked, "Ok how much[?]" (Doc. 3 ¶ 29.) Defendant responded, "5[.]" (Doc. 3 ¶ 29.) Co-Conspirator 2 asked, "Stacks[?]" (i.e., thousands of dollars). (Doc. 3 ¶ 29.)   Defendant responded, "[Y]es sir[.]" (Doc. 3 ¶ 29.) He further explained that it was 25,000 rounds of ammunition total, "which is 30 cans[.]" (Doc. 3 ¶ 29.) Over the next two weeks, Defendant stole and sold 66 boxes of M855 (the first 30 cans are pictured below, left, and all 66 cans are pictured below, right).  (Doc. 3 ¶¶ 29-33.)

 

Law enforcement later seized about a third of these sealed M855 cans from Co-Conspirator 2's house. (Doc. 3 ¶ 33.) This came less than a week after Defendant's text messages show he was at Co-Conspirator 2's house where he had picked up a "bag of money." (Doc. 3 ¶ 33.) Law enforcement traced the lot number on these cans from the Tooele Army Depot to the Ammo Supply Point at Camp Pendelton. (Doc. 3 ¶¶ 30, 34.)

However, although Defendant possessed and delivered about 60 sealed cans of ammunition with this lot number from Camp Pendleton, U.S. Marine Corps records for the School of Infantry West do not show it ever received ammunition with this lot number—meaning a large amount of rounds of U.S. military ammunition were diverted from the Ammo Supply Point. Law enforcement also seized unsealed cans from Co-Conspirator 2, traced the lot numbers from the Tooele Army Depot, to the Ammo Supply Point at Camp Pendelton, and to the School of Infantry West, and confirmed that Defendant had signed out ammunition with two of the lot numbers on March 15, 2024 and August 13, 2024. (Doc. 11 ¶¶ 12-13.)

Moreover, the prospect of a long prison term—given that his offense involved stealing Javelin Missile Systems—gives Defendant a strong incentive to flee. If convicted, Defendant faces up to 5 years' imprisonment for his conspiracy charge, and 10 years' imprisonment for each of his substantive charges. 18 U.S.C. §§ 371, 641, 922(j), 924(a)(1). Such circumstances justify Defendant's detention. *See United States v. Townsend*, 897 F.2d 989, 995 (9th Cir. 1990) (defendants deemed to have a greater incentive to flee when faced with the possibility of lengthy prison sentences); *United States v. Anderson*, 384 F. Supp. 2d 32, 35 (D.D.C. 2005) (ordering detention where defendant had no prior felonies and "no history of violent criminal activity," in part because "[t]he combined statutory maximum penalties for the federal crimes with which [defendant] is charged is 23 years ….").

**B.      Nature and Seriousness of Danger to Community**

Like the nature and circumstances of the offense, the danger Defendant poses to the public strongly weighs in favor of detention. It is hard to overstate the danger to the public and law enforcement that Defendant's crimes here pose. Javelin Missile Systems are weapons of war; they were used in Afghanistan and Iraq in more than 5,000 engagements. *See* Raytheon, Javelin Weapon System, https://www.rtx.com/raytheon/what-we-do/land/javelin-missile (last visited Mar. 25, 2026). M855A1 is federally controlled and cannot legally be possessed by the public because it presents too great of a threat to civilians and law enforcement. *See* 22 U.S.C. §§ 2778, 2794(7); 22 C.F.R. § 121.1 The United States Munitions List, Category III – Ammunition and Ordnance, ¶ (b)(6) ("Projectiles that employ

tips (e.g., M855A1 Enhanced Performance Round (EPR)) or cores regardless of caliber, produced from one or a combination of the following: Tungsten, steel, or beryllium cooper alloy"); *see also* Woods, Lt. Col. Jeffrey K. Woods, U.S. Army, Evolution of the M855A1 Enhanced Performance Round, https://www.army.mil/article/48657/evolution_of_the_m855a1_enhanced_performance_round (Nov. 26, 2010) (last visited Mar. 25, 2026).

And although M855 can legally be purchased and possessed by the public directly from the manufacturer (not from the U.S. military), news reporting highlights the obvious risks to the public of someone siphoning millions of rounds M855 from the U.S. military. Here, the U.S. Army used its records to trace multiple lot numbers from Tooele Army Depot, to the Ammo Supply Point at Camp Pendelton, and to the School of Infantry West. These records show that for each of these lot numbers—including the same lot numbers on sealed cans of M855 that undercover law enforcement purchased from the CEO of Company 2, about 1 million rounds were issued to the School of Infantry West. The problem is that the U.S. Marine Corps records do not show those lots ever being issued to the School of Infantry West. So that leaves about 2 million rounds of M855 unaccounted for—less the cans undercover law enforcement recovered by purchasing them at gun shows in Arizona.

### C.    Weight of the Evidence Against Defendant

The strength of the evidence—though the least important of all the factors—further supports the finding that Defendant is a danger, serious flight risk, and likely to obstruct or attempt to obstruct justice. Defendant's role in the conspiracy as the active-duty U.S. Marine stealing U.S. military weapons and ammunition, transporting them to his home state of Arizona, and selling them for his own financial gain is clearly laid out in the Complaint (Doc. 1) and Indictment (Doc. 11). And these allegations are supported by a mountain of evidence that Army CID, HSI, and ATF gathered during a lengthy investigation.

For example, law enforcement has text messages between Defendant and Co-Conspirator 2 and between Co-Conspirator 2 and the CEO of Company 2, proving each's knowing role in the conspiracy; U.S. Army records tracing stolen U.S. military ammunition to the Ammo Supply Point at Camp Pendelton; U.S. Marine Corps records of Defendant

signing out the Javelin Missile System with serial number 321675 and lot numbers of M855 that law enforcement purchased or seized from Company 1, Company 2, and Co-Conspirator 2; phone records showing Defendant's phone service stopped just days after law enforcement executed a federal search warrant on Co-Conspirator 2's home; and an interview of Defendant's parents who told law enforcement he claimed he accidentally drove over his phone. The weight of the evidence is strong and demonstrates the clear danger Defendant poses if he is not detained. And when combined with Defendant's potential lengthy prison term, it creates a serious risk of flight to avoid prosecution in Arizona.

### D. History and Characteristics of Defendant

Defendant's pre-2022 positive history and characteristics cannot overcome the evidence that proves he poses a danger to others and the community and that he is a serious flight risk and likely to obstruct or attempt to obstruct justice. Defendant has been an active-duty Marine since 2021, shortly after he graduated from high school in Glendale, Arizona. (PTSR at 2.) While serving in the Marines, Defendant has never been disciplined. (PTSR at 2.) He is in excellent physical condition. (PTSR at 3.) He has never used drugs. (PTSR at 3.) He has no mental health issues. (PTSR at 3.) He comes from a loving family with a father, mother, and sister, and he and his entire family are U.S. citizens. (PTSR at 2.)

Even so, Defendant's positive track record prior to deciding to start stealing and selling U.S. military weapons to enrich himself in 2022 cannot overcome that he violated the public's trust and put the public in danger. Nor can Defendant's positive track record overcome the fact that once Defendant learned law enforcement was closing in on him, he destroyed evidence proving his guilt. Finally, Defendant's positive track record cannot overcome the fact that he will have to report wherever the U.S. Marine Corps instructs him to, making him either a serious flight risk (if that is overseas in Myanmar as planned) or likely to obstruct or attempt to obstruct justice (if that is back to Camp Pendleton).

### V. CONCLUSION

For these reasons, the United States respectfully requests that this Court enter an order (1) finding that there are no conditions or combination of conditions that will

reasonably assure the appearance of Defendant as required or ensure that Defendant does not obstruct or attempt to obstruct justice, by a preponderance of the evidence, and the safety of others, by clear and convincing evidence, and (2) detaining Defendant pending trial.

Respectfully submitted this 26th day of March 2026,

TIMOTHY COURCHAINE
United States Attorney
District of Arizona

s/ Bruce R. Van Baren
BRUCE R. VAN BAREN
Assistant United States Attorney

11

**CERTIFICATE OF SERVICE**

I certify that on March 26, 2026, I electronically transmitted the foregoing to the Clerk's Office using the Case Management/Electronic Case Filing System ("CM/ECF"), which will automatically serve a copy via email to call CM/ECF registrants pursuant to Fed. R. Crim. P. 49(3)(A), Local Rule (Criminal) 49.3, and Local Rule Civil 5.5(h).

.

*s/ Bruce R. Van Baren*
U.S. Attorney's Office